IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) CASE NO. 5:23-CR-13 (MTT) |
| | ) |
| JAMES JACKSON, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**ORDER**

Defendant James Jackson is charged in a single count indictment with possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(c). Doc. 1. Jackson has moved to suppress evidence of narcotics recovered from a vehicle he was driving on June 29, 2022. Doc. 34. This evidence is the subject of the present indictment. The Court convened an evidentiary hearing on January 17, 2024. Doc. 38. For the following reasons, Jackson's motion (Doc. 34) is **DENIED**.

**I. FINDINGS OF FACT**

The Court finds that the evidence admitted at the hearing on Jackson's motion establishes the following facts by a preponderance of the evidence. *United States v. Beechum*, 582 F.2d 898, 913 n.16 (5th Cir. 1978) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).[1] These facts come from the hearing and are supported by body camera footage. Docs. 39, Ex. 1; 41.

On June 29, 2022, Jackson was driving south on I-75 when he was stopped by Corporal ("Cpl.") Jaleel Brown with the Monroe County Sheriff's Office for dark window

---

[1] The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

tint around 1:31 p.m.[2]  Docs. 39, Ex. 1 at 0:31; 41 at 4:24, 8:5-6, 8:14—9:7, 44:11.  The vehicle was owned by April Jordan, who was in the front passenger seat at the time of the stop.  Doc. 41 at 9:8-11, 9:22-24, 14:1.  Brown approached the passenger-side of the vehicle and asked for Jackson's license and insurance.[3]  *Id.* at 9:8-13, 19-24.  Jordan provided insurance information while Jackson looked through his phone for a picture of his driver's license because he did not have a physical copy.  *Id.* at 9:19-24.  Brown asked Jackson to step outside and spoke with Jackson at the rear of the vehicle.  *Id.* at 11:12-24.  Jackson told Brown that he and Jordan were returning to Dublin from the Tanger Outlet Mall and that they had left Dublin around 8:45 a.m. that morning.  *Id.* at 12:7-14.  It is "roughly an hour-and-a-half drive" from Dublin to Tanger, maybe "upwards of two hours … in traffic," which means "the amount of time they would have spent at Tanger would have been somewhat limited."  *Id.* at 26:10—27:11.  Brown then returned to the passenger side of the vehicle to measure the vehicle's window tint, which was in fact too dark.  Docs. 39, Ex. 1 at 4:40—6:02; 41 at 12:25—13:12.  While doing that, Jordan confirmed that she was the owner of the vehicle and told Brown that she and Jackson were returning to Dublin after visiting a friend in Atlanta and that "they came up the night before."  Doc. 41 at 13:13—14:1.  She did not know the friend's name and referred to him as "James' friend."  *Id.* at 13:15-16, 58:15-24.  When asked if they

---

[2] Brown has worked in law enforcement for roughly eight years.  Doc. 41 at 5:2-16.  As of June 2022, Brown worked in the criminal interdiction unit "probably upwards of a year and a half, two years."  *Id.* at 5:21—6:8, 8:14-23.  Because of his training and experience, he is familiar with patterns and red flags of narcotics trafficking.  *Id*. at 6:9-12.

[3] Brown testified that he noticed the smell of freshly sprayed air freshener coming from inside the vehicle.  Doc. 41 at 10:3-12.  Brown also testified that he did not "locate a spray bottle of air freshener, a static air freshener, or anything else that would have produced the odor that [he] said that [he] witnessed or observed."  *Id.* at 48:23—49:20.

went anywhere else, she said no. *Id.* at 58:24—59:1. At some point in that conversation, Jordan changed her story, stating the pair left for Atlanta that morning and that they did not spend the night. *Id.* at 13:18-21. Both Jackson and Jordan stated they were with each other the entire day; they were never separated. *Id*. at 13:22-24, 24:19-21.

Brown returned to his patrol car to write a warning citation and instructed Jackson to sit in the passenger seat of his vehicle with him. *Id.* at 16:2-16, 28:19-23. While running Jackson's license information, Brown asked Jackson additional questions about his and Jordan's trip and why their stories about where they were traveling were different. *Id.* at 28:19—29:8, 36:9—37:14. Jackson offered no explanation for the inconsistencies.[4] *Id.* at 38:3-5. Jackson continued to claim that the pair left that morning for the Tanger Outlet, went to only one store, bought nothing, and had lunch. *Id*. at 36:12-25, 37:8-11. According to Brown, this was odd given the current time and the "hour-and-a-half drive" drive between Dublin and the Tanger Outlet. *Id.* at 26:10-24, 37:1-6.

Jackson's license check revealed that he was on probation. *Id.* at 32:10-22. Brown asked Jackson a series of questions about his probation to identify "whether he had a violent offender sitting next to him" and continued writing the citation. *Id.* at 33:11—34:13. However, Brown inadvertently copied Jordan's information onto the citation instead of Jackson's and was forced to start over writing the citation. *Id.* at

---

[4] Jackson's motion claims that Brown did not ask him about the discrepancies between his and Jordan's stories until after calling for a K9. Doc. 34 at 4 n.3. However, the bodycam footage shows Brown asked at least some questions about the discrepancies before calling for a K9. Doc. 39, Ex. 1 at 9:35 to 10:56. Brown called for a K9 after Jackson declined his request for consent to search the vehicle. Docs. 39, Ex. 1 at 14:10; 41 at 40:10-16.

35:10-20. Brown testified that he commonly places an individual's license on the top of his ticket book, so he has ready access to information needed for the citation. *Id*. at 35:11-17. Because the car was registered to Jordan, Brown had Jordan's license in hand and mistakenly placed her license on his clipboard. Docs. 39, Ex. 1 at 7:32-50, 10:45-55; 41 at 35:10-25, 61:8-10. Approximately 13 minutes after Brown's first contact with Jackson and Jordan, as he was writing the citation, Brown asked Jackson crime-related questions, including whether there was any contraband in the vehicle; Jackson answered no. Docs. 39, Ex. 1 at 13:26-45; 41 at 39:2-14. Brown next asked Jackson for consent to search the vehicle, which he denied, and Brown subsequently radioed for another officer to bring his K9 to the scene to perform a free-air sniff around the vehicle's exterior. Doc. 41 at 40:10—41:11. The K9 alerted, the vehicle was searched, officers recovered narcotics from a bookbag located in the back seat, and Jackson was arrested. Docs. 39, Ex. 1 at 20:25-58; 41 at 17:1-11, 44:13-17, 51:8-13.

Based on the evidence recovered from the vehicle, a grand jury indicted Jackson on one count of possession with intent to distribute cocaine. Doc. 1. He filed his motion to suppress on December 11, 2023. Doc. 34. The Court held an evidentiary hearing on January 17, 2024. Doc. 38. On February 20, 2024, both parties filed supplemental briefs. Docs. 44; 45.

## II. STANDARD

Generally, the party moving to suppress bears the initial burden of persuading the court, through specific factual allegations and supporting evidence, that the evidence should be suppressed. *United States v. de la Fuente*, 548 F.2d 528, 533-34 (5th Cir. 1977). Once the movant establishes a basis for the motion, and Jackson has,

the burden then shifts to the Government to prove by a preponderance of the evidence that the search or seizure of evidence was legally and factually justified. *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) ("Upon a motion to suppress evidence gathered through a *warrantless* search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. The Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the [F]ourth [A]mendment." (internal citation omitted)); *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

### III. DISCUSSION

Jackson moves to suppress evidence recovered from the vehicle he was driving as the product of an unlawful search. Doc. 34. He argues the June 29, 2022 traffic stop was unlawfully prolonged to investigate crimes unrelated to the purpose of the stop without reasonable suspicion in violation of the Fourth Amendment. Docs. 34 at 8-12; 45. For the following reasons, the Court finds that the Government has carried its burden and the evidence should not be suppressed.

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures. U.S. Const. amend. IV. "Under the exclusionary rule, evidence obtained in an encounter that is in violation of the Fourth Amendment, including the direct products of police misconduct and evidence derived from the illegal conduct, or 'fruit of the poisonous tree,' cannot be used in a criminal trial against the victim of the illegal search and seizure." *United States v.*

*Perkins*, 348 F.3d 965, 969 (11th Cir. 2003).  A traffic stop is a seizure within the meaning of the Fourth Amendment.  *Whren v. United States*, 517 U.S. 806, 809-10 (1996).  The legality of these stops is analyzed under the standard articulated in *Terry v. Ohio*, 392 U.S. 1, 20 (1968), which requires an officer's investigation to be "reasonably related in scope to the circumstances which justified the interference in the first place."  *United States v. Ramirez*, 476 F.3d 1231, 1236 (11th Cir. 2007).  It is uncontested in this case that there was reasonable suspicion to stop Jordan's vehicle for dark window tint.  Doc. 41 at 63:11-21.  The only question is whether the traffic stop was unlawfully prolonged.

A traffic "stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes."  *United States v. Campbell*, 26 F.4th 860, 881 (11th Cir.), *cert. denied*, 143 S. Ct. 95 (2022).  "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns."  *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citation omitted).  Apart from "determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to the traffic stop,' such as checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Id.* at 355 (alterations omitted) (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)).  An officer may also conduct unrelated inquiries, so long as he does "not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."

*Id.* Any extension of time, regardless of length, to conduct unrelated inquiries is unlawful unless supported by reasonable suspicion. *Id.* at 355.

In this case, it is undisputed that questions about contraband and whether Jackson would consent to a search and calling for a K9 prolonged the stop and were unrelated to the reason for the traffic stop. Doc. 41 at 66:21—67:8. However, the Government argues Brown developed early in the stop reasonable suspicion of unlawful activity based on Jordan's and Jackson's inconsistent accounts of their travel. *Id*. Jackson argues the stop was delayed for the purpose of obtaining conflicting travel histories. Docs. 41 at 69:16-24; 45 at 1-2. He claims this line of questioning "has nothing to do with window tint and is by definition 'investigating other crimes.'" Doc. 45 at 2.

First, officers may ask "questions about travel plans" as "ordinary inquiries incident to a traffic stop." *Campbell*, 26 F.4th at 885; *United States v. Braddy*, 11 F.4th 1298, 1311 (11th Cir. 2021) ("[Q]uestions related to an individual's traffic plans or itinerary are ordinary inquires related to a traffic stop."). Because these questions are generally within the mission of all traffic stops, posing those questions does not unlawfully prolong a traffic stop. *Campbell*, 26 F.4th at 885 (collecting cases). Second, Brown learned of Jackson's and Jordan's accounts of their travel while engaged in the mission of the stop. Brown did not, as Jackson argues, prolong the stop to ask Jordan about the pair's travel itinerary—that conversation occurred while he was measuring window tint and confirming Jordan was the owner of the vehicle. Docs. 39, Ex. 1 at 4:40—6:02; 41 at 12:25—14:1; 45 at 2-4. Nor did Brown return to the vehicle solely to ask Jordan about travel plans as Jackson suggests. Doc. 45 at 1-2. Brown testified

that he returned to the vehicle to test the window tint and obtain Jordan's license because the vehicle was registered to her. Doc. 41 at 41 at 12:25—14:1. These inquiries were within the purpose of the stop.

Next, Jackson argues Brown lacked "articulable suspicion" because his suspicion "was based solely on allegedly conflicting stories—nothing particularized in any way." Doc. 45 at 4. "[R]easonable suspicion requires that the officer 'be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *United States v. Boyce*, 351 F.3d 1102, 1107 (11th Cir. 2003) (quoting *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990)). "[R]easonable suspicion is determined by the 'totality of the circumstances' such that, while some individual factors may be 'consistent with innocent travel ... [they can also], when taken together, give rise to a reasonable suspicion.'" *Id*. (alteration in original) (quoting *Tapia,* 912 F.2d at 1370). The inquiry is objective; an officer's subjective intent is irrelevant. *Campbell*, 26 F.4th at 885 n.21 (citing *Whren*, 517 U.S. at 813).

First, the Eleventh Circuit has recognized that "inconsistencies in travel plans can give rise to a reasonable suspicion." *Boyce*, 351 F.3d at 1109. For instance, "conflicting answers about where one is traveling to or from may give rise to a suspicion of drug activity because most drivers know the answers to these questions and because the driver may be trying to hide the fact that he is going to or coming from a known drug-source state." *Id*. Second, reasonable suspicion requires only a particular and objective basis for suspecting the detained person of criminal activity, not a particularized suspicion of a specific crime. *See United States v. Jones*, 752 F. App'x 810, 813 (11th Cir. 2018) ("[T]here is no requirement for an officer to cite a statute or

name a crime in order for the district court to conclude that reasonable suspicion of criminal activity objectively existed."). In any event, Brown's testimony suggests specific activity—transporting contraband. Brown testified that Jackson was driving along a known route for drugs and human trafficking, or the "main vein" between Miami and Atlanta, both of which are hubs for drug activity. Doc. 41 at 7:24—8:23.

In sum, Jackson and Jordan had irreconcilable accounts of where they had been, when they left, and what they were doing, but yet they were together throughout that time.[5] *Id.* at 12:4-14, 13:10-25, 14:2-17, 24:19-21. Brown testified that the conflicting stories immediately raised his suspicions together with other red flags he observed. *Id.* at 14:11-13. When Brown asked Jackson about the discrepancies, he offered no explanation for the inconsistencies which could dispel Brown's suspicions. *Id.* at 38:3-5. Jackson continued to claim that the pair went to the outlet mall and that they left that morning. *Id.* at 36:12-25.

> At that point, [Brown said,] I concluded to myself that due to the travel plans and the difference in stories, um, after we talked about the timestamp from Dublin to Tanger, we didn't buy anything at Tanger, it was kind of like a wasted trip, all of those red flags concluded to me that some type of criminal activity was afoot …

*Id.* at 39:18-24. Based on these facts, Brown acquired reasonable suspicion to think Jackson may be engaged in unlawful activity when he asked Jackson whether there was contraband in the car and whether he would consent to a search.

As discussed, Brown acquired the information giving rise to his reasonable suspicion during the mission of the stop. The conflicting stories surfaced during

---

[5] Again, Brown testified that Jordan reported that she and Jackson went to see a friend and spent the night in Atlanta. Doc. 41 at 13:10-25. She did not know the friend's name and referred to him as "James' friend." *Id.* at 13:14-17, 25:20—26:4, 58:23-25. When asked if they went anywhere else, she said no. *Id.* at 58:18-22. Jordan also changed her answer about spending the night in Atlanta. *Id.* at 13:10-25.

Brown's initial contact with Jackson and while he was measuring window tint.  And the interaction with Jackson while sitting in his patrol car occurred while Brown was writing the citation. [6]  While Jackson suggests that Brown deliberately prolonged the stop when he rewrote the citation, Brown's explanation is plausible, and the Court finds it credible.  Thus, the facts giving rise to Brown's reasonable suspicion of criminal activity surfaced before Brown departed from the mission of the stop when he asked Jackson if he was transporting contraband.  Further, the Court finds that those facts provided a reasonable officer an objective and particularized basis to suspect criminal activity.

Once Jackson said no, Brown called for a K9 and properly took Jackson's refusal to consent to the search into account.[7]  When the K9 alerted to drugs inside the vehicle, that gave the officers probable cause to search the vehicle.  *United States v. Tamari*, 454 F.3d 1259, 1264-65 (11th Cir. 2006) (holding that the officers had probable cause to search the vehicle once the narcotics detection dog "alerted [them] to the presence of narcotics in the rear of the vehicle").  Accordingly, Jackson's motion to suppress (Doc. 34) is **DENIED**.

---

[6] Jackson argues Brown added time to the stop by requiring Jackson to sit inside his vehicle with him. Doc. 45 at 4.  However, Brown testified that one of the reasons for this request was to keep Jackson and himself safe from oncoming traffic and so that he could more easily speak to Jackson, as he had difficulty hearing him on the side of the road.  Doc. 41 at 29:13-21, 57:4-11.  The Court cannot say that this was beyond the purpose of the stop or objectively unreasonable.

[7] *See Boyce*, 351 F.3d at 1110 ("[A] detainee's refusal to consent to a search . . . may [] be considered [as a basis for extending a traffic stop] when the police have already observed, before asking for permission to search, facts sufficient to raise a reasonable suspicion.").

## IV. CONCLUSION

Because the officers had reasonable suspicion to detain Jackson and probable cause to search Jordan's vehicle and arrest Jackson, the evidence discovered from the vehicle should not be suppressed.  Accordingly, Jackson's motion (Doc. 34) is **DENIED.**

**SO ORDERED**, this 18th day of March, 2024.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT
